Filed 3/2/15  In re Eva D. CA5

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re EVA D., a Person Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JUAN D.,<br><br>    Defendant and Appellant. | F069256<br><br>(Super. Ct. No. 13CEJ300191-1)<br><br>**OPINION** |

## THE COURT[*]

APPEAL from an order of the Superior Court of Fresno County.  Mary Dolas, Commissioner.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant.

---

[*]        Before Gomes, Acting P.J., Kane, J. and Franson, J.

Daniel C. Cederborg, County Counsel, and Amy K. Cobb, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Juan D. appeals a juvenile court order denying his request to be declared the presumed father of Eva D, whose mother is Tiffany J. (mother).  We affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother and Eva came to the attention of the Department of Social Services in September 2012, when they both tested positive for methamphetamine at Eva's birth. Mother had not received any prenatal care and admitted to methamphetamine and cocaine use during her pregnancy.  Mother accepted the Department's offer of voluntary family maintenance services, which were to include substance abuse treatment, mental health and domestic violence assessments, parenting classes and random drug testing.  By April 2013, mother had relapsed twice.  At a team decision meeting that month, it was recommended that Eva remain in mother's care if mother entered residential treatment. Mother entered a residential program, but was discharged in May 2013 because she continued to use drugs and have unauthorized contact with Juan.  Mother then entered the Marjaree Mason Center.  A week later, mother left the center and never returned, leaving her personal belongings behind.

On May 28, 2013,[1] the social worker spoke with Juan's mother, Maria H., who said she had not heard from mother, but she would immediately contact the social worker if she should come into contact with mother or Eva.  The social worker also spoke with the maternal grandmother, who said she talked to mother on the telephone on May 26, but mother would not disclose her or Eva's whereabouts.

On June 26, the social worker contacted Maria, who said Eva had been in her care as of the prior day.  Social workers visited Eva, who was in the care of Juan's sister,

_____

[1] Subsequent references to dates are to dates in 2013 unless otherwise noted.

2.

Michelle P. Michelle said that Eva had been in Maria's care for nearly two weeks and that Juan remained in Maria's household. Family members were concerned, as Juan was suspected of using drugs and he was allowing mother into the home when Maria was working. The social workers attempted to place a protective hold on Eva, but police denied the request as mother was not present to confirm the events.

On June 28, the Department filed a dependency petition alleging nine-month-old Eva came within the provisions of Welfare and Institutions Code section 300, subdivision (b)[2] because of mother's unresolved substance abuse problem, the whereabouts of Eva and mother were unknown, and there was ongoing domestic violence with Juan.

The juvenile issued a protective custody warrant on July 1, and Eva was taken into protective custody that day. Mother's whereabouts were unknown. In a report prepared for the detention hearing, the social worker stated that mother said Juan was Eva's father. He was incarcerated at the time of Eva's birth; therefore he did not sign the declaration of paternity and was not listed on the birth certificate. The Department considered Juan to be an alleged father. Maria requested placement of Eva, but the Department was concerned about Maria's ability to protect Eva from mother and Juan, as Maria continued to allow them into the home. Moreover, while Maria may have denied Juan resided in the home, according to Juan's probation officer, his listed address remained at Maria's home. The juvenile court detained Eva from mother on July 3 and placed her in foster care.

At the July 24 jurisdiction hearing, Juan, who was in the custody of the Fresno County Sheriff, and mother made their first appearances and attorneys were appointed for them. The juvenile court explained to Juan that he was considered to be an alleged father, and he might want to discuss his paternity status with his attorney and whether he wanted to change it, especially since his mother was requesting placement. Father's

---

[2] Undesignated statutory references are to the Welfare and Institutions Code.

attorney requested a paternity test, which the juvenile court ordered. Mother identified Juan as Eva's father. She stated that while she believed she put his name on the birth certificate, Juan was not there to sign it. The court told mother to provide the Department with a copy of any document, declaration of paternity or birth certificate that contained Juan's name. The juvenile court ordered reasonable, twice-monthly, supervised visits between Eva and Juan. The hearing was continued to August 14.

Juan was present in custody at the continued hearing. Maria had been approved for placement, but the Department was assessing her ability to provide safety and protection for Eva due to her history of allowing the parents to visits Eva while under the influence of drugs, her failure to report that she had Eva in her care for two weeks when she knew the Department was looking for her, and the fact that Juan listed her address as his permanent mailing address, which would indicate he would retrieve his mail at the home while Eva was present. After mother submitted on the report, the juvenile court found the allegations of the first amended petition true.

Father appeared in custody at the October 16 dispositional hearing. The paternity test showed that Juan was excluded as Eva's biological father. Accordingly, County counsel stated that Juan was no longer a party as far as the Department was concerned, unless he wanted to elevate himself to presumed non-biological father status. Juan's attorney asserted that biology was not determinative on the issue of presumed father status and Juan had taken Eva into his home and held her out as his own. His attorney further stated that he had a parent-child bond with Eva, who knew him as her father, and they would file a "JV-505" enumerating the contacts Juan had with Eva throughout her young life. County counsel responded that she was not sure why a JV-505 had not been filed already, since it appeared that biology was not an issue for Juan.

The juvenile court stated it would not remove Juan from the case to allow him the ability to provide whatever information he believed he had to elevate his paternity status. Juan remained an alleged father. The juvenile court denied Juan's attorney's request to

set the matter for a contest on father's status or to allow him to present evidence at that time as his status, as there had been an opportunity for his attorney to set the matter and file the appropriate documents, and no one was prepared to proceed on the matter. The juvenile court explained to Juan's attorney that she would have to determine how she and Juan wanted to proceed procedurally and file the appropriate documents. The juvenile court ordered Eva removed from mother's care; gave mother reunification services; denied services to Juan pursuant to section 361.5, subdivision (a) and suspended his visits; and set a status review hearing for November 20 and a six-month review hearing for April 9, 2014. No appeal was taken from the dispositional orders.

Juan and his attorney were present at the November 20 hearing. A mediation had been held, but mother did not appear. The juvenile court adopted the mediation agreement, which stated that family reunification remained the case plan goal.

In December 2013, Ernie R. contacted the Department and requested a paternity test. The Department asked the juvenile court to order a paternity test. At a January 7, 2014, hearing on this request, which Juan, who was still in custody, did not attend, Juan's attorney informed the juvenile court that a JV-505 had been prepared and she only needed to obtain Juan's signature. Juan's counsel asked that a hearing be set because Juan should have been brought from the jail. The juvenile court responded that once the JV-505 was completed and filed, she could ask for a hearing, and even though Juan was not present, he was not prevented from completing any necessary documents, having them filed, and requesting a hearing before the six-month review hearing set for April 9, 2014.

On January 17, 2014, Juan filed a "Statement Regarding Parentage," form JV-505, in which he stated he believed he was Eva's parent and asked the juvenile court to enter a judgment of parentage. He asked the court to find he was Eva's presumed parent because she lived with him from September 2, 2012 to July 1, 2013, and he told the following people that Eva was his: his mother, Maria; his stepmother and father; and his brother

5.

and his wife. Juan further stated that Eva lived with mother, Maria and himself during the dates provided; that mother moved into the home long before Eva's birth; and they spoke of Eva being his child before her birth. Juan stated he usually went with mother when she went out with Eva; read to Eva; changed her diapers; and watched Eva when mother left the house to run errands or to take a break from caring for Eva. Juan said he gave Eva diapers, wipes, book, toys and food, and he had multiple pictures of Eva with him.

To convey his feelings for Eva, father attached an original JV-505 that he filled out without the aid of an attorney; the form was dated November 7. In that document, Juan stated that he had told numerous people, who he listed, and his family that Eva was his daughter; he had participated in a lot of activities with Eva as her dad, including watching television, playing with her and her toys, and taking naps with her; he had given Eva everything he possibly could, including toys, a car seat and a crib; Eva spends time with his family, who love and adore her, and she had been with his family since birth; and he loved Eva. Juan further stated that his mother, Maria, had been there for him and Eva since before Eva's birth; that he and mother stayed with Maria since Eva was conceived; and Maria was at the hospital when Eva was born. He explained that he and mother would watch cartoons with Eva, they would take Eva to a park, they went for walks with Eva in her stroller, and would take Eva to family functions.

On March 12, 2014, the juvenile court excluded Ernie from the case, as his paternity test showed that he was not Eva's biological father. The six-month review hearing was continued to April 16, 2014, at which time the JV-505 would be heard. The Department recommended termination of mother's services and that Juan be excluded as a party to the case because he was not a biological or presumed father.

In the social worker's report prepared for the hearing, the Department asserted that Juan's actions, namely domestic violence with mother, substance abuse and incarceration, were inconsistent with the role of a parent, and did not demonstrate

nurturing parenting with Eva's best interests in mind or a full commitment to his parental responsibilities. While Juan claimed he held Eva out to be his own and participated in raising her, he was incarcerated one day after her birth and had been incarcerated much of her life: he was incarcerated from September 3, 2012 to February 2013; arrested again on March 27, 2013 and released; and arrested again on July 10, 2013. Before Eva's removal, Juan and mother engaged in domestic violence while mother and Eva were living in an inpatient substance abuse treatment program. Due to Juan's incarcerations, he had been unable to have Eva in his home. Mother and Eva lived in Maria's home, where Juan lived when he was not incarcerated. However, when Juan was released from jail in February 2013, mother and Eva were residing in a residential treatment program, not with Juan.

The social worker further pointed out that Juan did not take prompt legal action to obtain custody of Eva or to elevate his paternity status in the juvenile court. While he had demonstrated a persistent interest during these proceedings in remaining Eva's father, he failed to file a JV-505 in a timely manner. Juan was informed before the dispositional hearing of his right to provide such a document to the court requesting elevation of his paternity status, but he failed to provide this document until several months later, after it was established that Juan was not Eva's biological father. Juan's name is not on Eva's birth certificate, and he and mother had not signed a declaration of paternity naming Juan as father.

The social worker told mother that neither Juan nor Ernie was Eva's biological father. Mother could not provide any other names as to the possible biological father of Eva. Therefore, the Department had no leads as to Eva's biological father.

Eva's counsel filed a written opposition to Juan's JV-505 request for presumed father status. Counsel argued that Juan had not made an adequate showing that he received Eva into his home, since the home he lived in was his mother's, not his, and he was incarcerated for much of Eva's life, or that he openly held her out as his own, as he

7.

did not take prompt legal action to obtain custody of Eva or to elevate his paternity status. Eva's counsel asked the juvenile court to deny Juan's request and exclude him from the case as a non-biological father.

Juan's counsel filed a written reply to the Department's recommendation. He asserted the evidence showed that before Eva's birth, mother moved into the home where he lived, which belonged to Maria. He and mother spoke of Eva as being his child before her birth. At Eva's birth on September 2, 2012, mother provided Eva with Juan's surname. When released from the hospital, mother returned to live in Maria's home, where she lived until July 1, 2013. During that time, Juan also lived in the home, except when he was in custody; the total time he lived in the home with Eva was approximately five months. Juan was in custody on the following dates: (1) September 3, 2012 to February 12, 2013; (2) March 27-28, 2013; (3) July 7, 2013; and (4) from July 9, 2013 to the present. Juan and his family love Eva, and he kept photographs of her while in-custody, copies of which were attached to the reply.

Juan contended he met the definition of presumed father because five months was a sufficient time to establish that he had received Eva into his home, and he held her out as his own child to multiple people. He asserted the burden then shifted to the Department to prove by clear and convincing evidence that he had engaged in abuse of Eva sufficiently severe to rebut the presumption of paternity, but the Department had not offered any such evidence. Juan further asserted that unless the Department or Eva's attorney wanted a contested hearing, the juvenile court should grant the JV-505 petition as a matter of law.

Juan appeared in-custody at the April 16, 2014 hearing on his JV-505. County counsel asked the juvenile court to deny the JV-505, as Juan had not met his burden of proving he was a presumed father. Eva's counsel submitted on her written memorandum and the social worker's report. Juan's counsel asked that the JV-505 be set for trial, as it appeared that some of the facts were in dispute. County counsel and Eva's counsel both

objected to the matter being set for trial, as they believed this was the date set for trial and Juan could have requested a trial at the last hearing.

The juvenile court found the JV-505 untimely, explaining that it gave Juan the opportunity to present a JV-505 or any evidence regarding his paternity status prior to disposition. It was unclear to the court why, given this opportunity, Juan made little to no attempt to change his paternity status at that time. At disposition, the court determined Juan was not the biological father and he had not provided any evidence to show he met the criteria for presumed father status. The court further explained that it gave Juan an opportunity to address the paternity status at the November 20 review hearing, where he again failed to make any attempt or effort to address paternity. The court did not understand the purpose of filing the JV-505 at that time, as it believed it was determined at disposition that Juan did not meet the criteria for presumed father status. Juan's counsel stated that he had received a JV-505 that Juan had filled out about four weeks before counsel filed the JV-505 in January 2014, which explained part of the delay.

The juvenile court also found Juan did not meet the legal criteria for presumed father status, as when there is no biological connection, he must show either that there was a "more familiar relationship" or that he attempted to marry mother. There was no evidence, however, that Juan attempted to marry mother. Moreover, there was insufficient evidence that Juan ever took Eva into his own home or provided for her. Instead, while the evidence showed that he permitted mother and Eva to live with his mother for a brief period of time, where he also lived, there was no evidence he had a father-child relationship with Eva, or that he attempted to list his name on the birth certificate or sign a declaration of paternity. Accordingly, the juvenile court denied the JV-505. The juvenile court set the six-month report and recommendation for a contested hearing, to be held in May 2014.

## DISCUSSION

For purposes of dependency law, only presumed fathers are entitled to reunification services and to custody. A presumed father is a man who, whether or not he is the biological father of the child, falls within one of the categories enumerated in Family Code section 7611. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 448–449, 450, fn. 18.) Family Code section 7611, subdivision (d), on which Juan relies, provides that a man is presumed to be the natural father of the child if he "receives the child into his or her home and openly holds out the child as his or her natural child."

Juan contends he is entitled to a finding that he is Eva's presumed father because he presented unrebutted evidence which showed he took Eva into his home and held her out as his daughter, and therefore there is insufficient evidence to support the juvenile court's finding that he failed to satisfy his burden of proof. The Department, on the other hand, contends we must uphold the ruling because the juvenile court did not abuse its discretion in denying the request.

Neither party is correct. Juan had the burden of proof as to the foundational facts, i.e., that he took Eva into his home and openly held her out as his natural child. (*In re Spencer W.* (1996) 48 Cal.App.4th 1647, 1653.) The juvenile court found that Juan failed to meet this burden. Our review does not depend upon whether substantial evidence supports that finding. The substantial evidence rule "is typically implicated when a defendant contends that the plaintiff succeeded at trial in spite of insufficient evidence," i.e., that plaintiff/respondent failed to meet his or her burden of proof. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527–1528.) In a case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, however, "it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion

10.

that the party with the burden did not prove one or more elements of the case." (*Id.* at p. 1528.)

Where the issue on appeal turns on a finding that the *appellant* failed to meet his or her burden of proof at trial, the question is therefore not whether substantial evidence supports the judgment, but "whether the evidence *compels* a finding in favor of the appellant as a matter of law." (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528, italics added, citing *Roesch v. De Mota* (1944) 24 Cal.2d 563, 570–571.) Accordingly, the question in this appeal is whether the evidence was sufficient, as a matter of law, to compel a finding that Juan qualified as a presumed father pursuant to Family Code section 7611, subdivision (d). (*In re I.W., supra,* at p. 1528.) We conclude that it was not.

Juan contends the evidence showed he lived with Eva in Maria's home for approximately five months, and he was the one who received Eva into the home, with Maria's help, and provided a place for mother and Eva to stay. The record, however, shows that when Eva came to live with Maria following her birth on September 2, 2012, Juan was not in the home, as he was incarcerated. According to the Department, two months after Juan's release from jail in February 2013, mother and Eva were living in a residential treatment program, and Eva did not return to Maria's home until sometime in mid-June, when Maria took Eva into her care. Eva remained in Maria's home, where Juan was also living, until Eva was taken into protective custody on July 1, 2013. Moreover, while Juan asserts that he provided for Eva by purchasing baby supplies and toys, there is no evidence that he contributed any money to provide for a home.

Based on this record, the juvenile court could find that Juan lived with Eva at most three months of her life, and that it was not Juan who received Eva into his home, but rather Maria who received Eva into hers. Although a trier of fact may be able to find the first prong of Family Code section 7611, subdivision (d) is satisfied if the putative presumed father established a home with the child, regardless of whether it was in a home

11.

which was his mother's or in a separate home which was solely his, the evidence that Juan lived with Eva for three months in a home belonging to his mother, who was the one providing care for Eva, certainly does not *compel* that conclusion. (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528.)

Nor does the fact that Juan told his immediate family that Eva is his daughter compel the conclusion that he openly held Eva out as his natural daughter. He is not on Eva's birth certificate, he never signed a voluntary declaration of paternity and there is no evidence he paid child support. He did not file an appeal after being denied reunification services – a denial which, pursuant to section 361.5, subdivision (a), was tantamount to a denial of presumed father status. While Juan privately acknowledged his paternity to his immediate family, he has never publicly acknowledged Eva as his own child or taken any legal responsibility for her. (See, e.g. *In re Sarah C.* (1992) 8 Cal.App.4th 964, 971-973 [court held man was not a presumed father, despite evidence he acknowledged the child as his daughter to a few friends and had cared for the child for a few months, because he declined to identify himself as the child's father on the birth certificate, only briefly lived with the child in the mother's home, and contributed little to the child's support].)

In dependency proceedings, "the purpose of [Family Code] section 7611 ... is to determine whether the alleged father has demonstrated a sufficient commitment to his parental responsibilities to be afforded rights not afforded to natural fathers...." (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 804, italics omitted.) The essence of presumed fatherhood is the establishment of a substantial parent-child relationship, where the presumed father has fully embraced the responsibilities of parenthood—"emotional, financial, and otherwise" (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 849)—and has consistently acted in a parental role toward the child. (*In re Sarah C., supra,* 8 Cal.App.4th at pp. 972–973.) The evidence Juan presented demonstrates that he has not embraced his parental responsibilities toward Eva in any meaningful way.

12.

Accordingly, the evidence was not sufficient to compel the conclusion that he qualifies as a presumed father.

## DISPOSITION

The April 16, 2014 order denying Juan's JV-505 petition for presumed father status is affirmed.